JUDGE COTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARDWORKS PROCESSING, LLC, | Index No. _____ 12 CV 2218 |
| Plaintiff, | |
| vs. | COMPLAINT |
| BANKCARD CENTRAL, INC., | |
| Defendant. | |

Plaintiff, CardWorks Processing, LLC ("CWP"), by and through its attorneys, Satterlee Stephens Burke & Burke LLP, as and for its complaint against Bankcard Central, Inc. ("BCC") respectfully alleges as follows:

## NATURE OF ACTION

1.    This is a contract action to recover (i) $257,757.35 plus interest for services rendered and (ii) attorneys' fees and costs as expressly provided in the parties' contract.

2.    CWP agreed to serve as a credit and debit card transaction processor for BCC.  Pursuant to the parties contractually agreed to schedule of fees, BCC was obligated to pay CWP for amounts invoiced.

3.    CWP timely and properly invoiced BCC for services rendered.

4.    BCC has unjustifiably refused to pay the amounts due and owing, in clear breach of its contractual obligations.

## THE PARTIES

5.    Plaintiff is a limited liability corporation organized under the laws of Delaware with offices at 101 Crossway Park Drive West, Woodbury, NY 11797.

1377929_1

6.     Defendant is a corporation organized under the laws of Missouri, with its offices at 1321 Burlington, Suite B, North Kansas City, MO 64116.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 in that there is complete diversity of citizenship between the parties and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

9.     Further, pursuant to the Processing Services Agreement between CWP and BCC, dated as of March 25, 2009 (the "Processing Agreement"), the parties have agreed to the exclusive jurisdiction and venue of New York courts with respect to any litigation arising out of the agreement. A copy of the Processing Agreement is attached hereto as Exhibit A.

## FACTUAL BACKGROUND

10.     Generally, merchants that accept credit and debit cards as a means of payment for their goods and services rely on various intermediaries between themselves and the member bank that actually submits credit and debit card transactions to the systems of Visa, MasterCard and other electronic payment industry associations.

11.     BCC is a company that provides services to merchants to enable and assist them in the processing of their credit and debit card transactions.

12.     BCC in turn, must have a relationship with an entity that can connect BCC's merchants to the banks that are a part of the Visa and MasterCard networks.

13.     CWP provides the necessary transaction processing services for merchants, and pursuant to the Processing Agreement, agreed to provide such services to BCC's merchants.

2

1377929_1

14.     Pursuant to the Processing Agreement, the fees payable by BCC for the transaction processing and related services provided by CWP were set forth on an agreed upon Schedule.  See Processing Agreement, § 7.1.

15.     On a monthly basis, CWP would invoice BCC for the services rendered and BCC was obligated to pay any such amounts not specifically disputed.  See Processing Agreement, § 7.2.

16.     CWP has properly invoiced BCC for service rendered.

17.     BCC has wrongfully refused to pay $257,737.32 plus interest due and owing to CWP.

18.     In the fall of 2011, CWP advised all its clients that it was going out of business and would no longer process transactions after February 28, 2012.

19.     Significantly, the Processing Agreement specifies that "[p]ayment for any services rendered or any other obligation or liability hereunder owing at the time of termination or thereafter shall not be affected by termination" of the agreement.  See Processing Agreement, § 10.2.

20.     Further, while CWP agreed to provide and did provide reasonable assistance to transfer BCC's merchants to another payment processor, the Processing Agreement states that "all costs of transfer shall be at [BCC's] sole expense based upon [CWP] then current rates for de-conversion of merchant accounts."  See Processing Agreement, § 10.3.

21.     Notably, the Processing Agreement also states that each party is liable to the other for "all costs, including reasonable attorneys' fees, incurred in connection with the cost of collection of any amounts due hereunder."  See Processing Agreement, § 7.2.

3

## COUNT I
### Breach of Contract

22.   The allegations of paragraphs 1 through 21 are repeated and re-alleged as if fully set forth herein.

23.   The Processing Agreement is a valid and enforceable contract negotiated at arms length.

24.   CWP performed its contractual duties under the Processing Agreement in all material respects.

25.   BCC's failure to pay CWP for services rendered under the Processing Agreement constitutes a material breach of its contractual duties.

26.   Because of these material breaches, CWP has been damaged in an amount to be determined at trial, but no less than $257,757.35 plus interest, as well as CWP costs and attorney's fees relating to his action.

WHEREFORE, Plaintiff prays that this Court:

(a)   award CWP damages in an amount to be determined but no less than $257,757.35, plus interest, costs and attorneys' fees; and

(b)   grant such other and further relief as this Court deems just.

Dated: March 26, 2012

SATTERLEE STEPHENS BURKE & BURKE LLP

By: _____
Daniel G. Gurfein
James Regan
230 Park Avenue, Suite 1190
New York, NY 10169
Tel: (212) 818-9200

*Attorneys for Plaintiff CardWorks Processing, LLC*

4

1377929_1

# PROCESSING SERVICES AGREEEMENT

This Processing Services Agreement (the "Agreement") is entered into this 25th day of March, 2009 (the "**Effective Date**") by and between CardWorks Processing, LLC ("**CWP**") with its principal place of business at 6390 E. Broadway, Tucson, AZ 85710 and BankCard Central, Inc. ("**Customer**") with its principal place of business at 105 El 5th Street, Kansas City, MO 64106.

WITNESSETH:

WHEREAS, CWP provides transaction processing services to financial institutions and other entities within the electronic payment industry; and

WHEREAS, Customer wishes to obtain transaction and other data processing and related services from CWP;

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows

**Section 1.**
**Definitions**

1.1    "ACH" means the Automated Clearing House which is the paperless entry system maintained by the Federal Reserve for the debiting and crediting of payment transactions

1.2    "Card Payment Companies" means either Visa USA, Inc., MasterCard Worldwide, Inc., Discover Financial Services, Inc. or the various debit or electronic card payment companies.

1.3    "Member" means any financial institution that is a member of the Card Payment Companies and that sponsors Customer for solicitation of merchant accounts.

1.4    "NACHA" means the National Automated Clearing House Association that sets standards and rules for electronic transmission of financial transactions via ACH.

1.5    "Processing Year" means each twelve (12) month period that begins on the Effective Date or on any anniversary thereof until termination of the Agreement pursuant to the terms hereof, provided that the Processing Year during which such termination shall occur shall end on the date of such termination.

**Section 2.**
**Services Performed**

2.1    <u>Jurisdiction for Services</u>.  Services to be performed under the terms of this Agreement shall apply only to those transactions originating at merchant locations solicited by Customer under the rules and regulations of the United States region of the Card Payment Companies. Prior to the implementation of clearing and settlement services for Customer,

1

Customer will have established a relationship with **Member** and will obtain Member's authorization for CWP to provide such services to Customer,

2.2  <u>Transaction Authorization and Data Capture</u>. CWP will provide point of sale communications for Customer's merchants to send authorization requests, receive responses and transmit captured data to CWP's systems. POS communications access will be offered via 950 and 800 dial-up, wireless transmission and any other methods as they become available through CWP from time to time. CWP will accept data files containing captured transaction data from other vendors authorized by Customer and certified with CWP's systems for clearing and settlement processing services.

2.3  <u>Interchange Clearing and Settlement Processing</u>. CWP will fully format captured transaction data records from its authorization systems or received from other processing vendors and will transmit such records into the Card Payment Companies' respective systems at such times as are determined by CWP and the respective Card Payment Companies but in any event no less than once daily to each Card Payment Companies. Customer and/or the Member will be provided with reporting of cleared transactions, rejects, retrievals and other items received in interchange settlement records, including net amounts to be paid by each Card Payment Companies to the account of the Member or by the Member to the Card Payment Companies, as the case may be.

2.4  <u>Electronic Funds Transfer</u>. Debit and **credit** records relating to Member's acquisition of merchant transaction card charges will be created in NACHA format and, at Member's option, either (a) made available for pickup and delivery into the ACH system by Member or (b) submitted to the Federal Reserve by CWP on Member's behalf

2.5  <u>Exceptions Management</u>. Full retrieval and chargeback processing as set forth in the Card Payment Companies' rules and regulations, including the entry of debit and credit items for adjustment and collection from Customer's merchants into the settlement processing systems and through the ACH system.

2.6  <u>Portfolio Management Services</u>. At Customer's election, CWP will provide one or more of the following portfolio support services, which will be more specifically described in CWP's Customer Services Operations Manuals:

(a)  <u>Account Activation</u>. Account data entry and setup on authorization and settlement systems and activation of approved accounts pursuant to Customer's or Member's written instructions.

(b)  <u>Risk Management</u>. Production and distribution of daily transaction reports for review and disposition by Customer.

(c)  <u>Customer Service</u>. Phone center staffing 24/7 to receive merchant account inquiries, perform related research services, provide written responses to inquiries not capable of phone resolution, field supply orders and forward such orders to Customer or its appropriate vendor .

(d)   <u>Merchant Training and Equipment Services</u>.  Equipment programming, installation assistance and merchant training via telephone.

(e)   <u>Other Services</u>. Other services for or on behalf of Customer as agreed upon in writing by the parties.

2.7   <u>Right of First Refusal.</u>  During the term of this Agreement and any renewal thereof, Customer shall grant to CWP the right of first refusal to all of Customer's merchants or potential merchants who seek transaction processing services and are accepted by a bank sponsoring CWP as a payment processor.  In the event that CWP cannot provide such services to a particular Customer merchant or potential merchant whose transactions are eligible to be processed by CWP, then and only then may Customer refer such merchant or potential merchant to another party to provide credit card transaction processing services.

2.8   <u>Communication Services</u>.  At Customer's request and expense, CWP will provide communications lines between CWP's facilities and one or more sites designated by Customer and appropriate server links and related services for the purpose of providing Customer with access to its merchants' data.

## Section 3.
## CWP Program License

CWP hereby grants to Customer a non-exclusive and non-transferable license to use any proprietary products of CWP that may be required in connection with the performance of this Agreement.  This license, regardless of product covered hereby, shall terminate immediately upon termination of this Agreement whether for cause or otherwise. In the event Customer elects to use any portion of PurchasePoint$^{TM}$ (CWP's proprietary suite of Internet-enabled applications), a separate written grant of license and payment of applicable fees shall be required prior to delivery of PurchasePoint to Customer and Customer covenants not to use any portion of PurchasePoint prior to obtaining such license. ]

## Section 4.
## Debit and Electronic Benefits Transfer Services

4.1   CWP has entered into an agreement with Carrollton Bank, Baltimore, Maryland, pursuant to which the bank has agreed to sponsor Customer should Customer wish to obtain debit and Electronic Benefits Transfer ("EBT") services. Processing services for debit and EBT transactions will be provided by CWP, either directly or through a vendor certified by CWP to provide such services.  CWP understands that Customer has it own direct relationship with Carrollton Bank and will provide service to Customer in support of its independent agreement.

4.2   Customer acknowledges that CWP has no liability whatsoever for, and holds CWP harmless and indemnifies CWP from, losses incurred in connection with debit or EBT activities of Customer, whether such losses arise from fraud, error or otherwise, except as may otherwise be set forth in this Agreement. Customer agrees that it shall at all times comply with federal and state government rules and regulations relating to the acceptance of EBT transactions and that CWP's liability for providing debit and EBT services is limited as set forth in Section 11.3.

4.3    Customer will provide documentation and information to CWP required to establish CWP as a debit and/or EBT participant and assumes full liability, without any limitation of damages whatsoever, for any erroneous or fraudulent information provided.

## Section 5.
## Web-Enabled Services

5.1    CWP will provide Customer with access to Customer's data stored on CWP's servers and systems (collectively, "**Systems**") and shall provide to Customer the means by which to retrieve, view, collect and utilize such data for Customer's business purposes ("**eIA Reports**").   Retrieval, viewing, collection and utilization will be web-enabled to provide Customer with communications access via the internet.  At its sole expense, Customer may also utilize dial up, lease line or other communications methods reasonably available to access the Systems. Customer will be charged for eIA reports utilized by Members and Customer as set forth in Schedule A.

5.2    Customer acknowledges that eIA reports are not custom services specific to its requirements but are services and functions selected by CWP to be generally available to its customers at such times and in such a manner as CWP shall determine in its sole discretion. CWP retains the right to modify and update functionality and to include such modifications and updates as eIA reports and to amend Schedule A accordingly.

5.3    Ownership and Use of ASP Services.  Customer recognize that eIA reports are subject to the proprietary rights of CWP or third party providers of software and systems (such software and systems, collectively, "**Tools**") utilized for eIA reports. Customer agrees that Tools are trade secrets of their respective owners, are protected by civil and criminal law and by the law of copyright, are valuable to their owners, and that it is justifiable that their use is carefully and continuously controlled.  Customer acknowledges that no license or any other right, title or interest to Tools is conveyed by the use of eIA reports and that Customer does not have any right to license, re-sell or otherwise transfer eIA reports or to use in any manner any trademark that may be associated with any Tool.  eIA reports may be used by Customer  only to manage Customer's data and may not be used to perform services for any other party including any parent, affiliate, subsidiary or agent of Customer.

## Section 6.
## Cardholder Information Security and Compliance with Law

6.1    The parties acknowledge that the Card Payment Companies have specifically imposed certain Payment Card Industry ("PCI") data security standards on its members and their agents. Therefore, the parties hereto hereby covenant that:

(a)    Their security policies and procedures are now, and at all times during the term of this Agreement will be, compliant with PCI requirements and that they will undergo any Card Payment Companies required PCI audit or review;

(b)    They will implement firewalls or such other safeguards as are normal and customary where open communication methods (for example, the internet, virtual private

4

networking and frame relays) are utilized to ensure that their respective systems cannot be used as a pathway to gain access to any cardholder data that might reside thereon;

(c)     They will not, and Customer agrees to cause Members not to, transmit any unencrypted cardholder numbers or expiration dates by any open communication method unless legally required to do so by state or federal agency or authorized Card Payment Companies personnel; and

(d)     Each will notify the other if it has reason to believe there has been any breach in the security of its systems that might compromise the other parties' systems or CWP's obligations under the Card Payment Companies rules.

6.2     In the performance of its obligations hereunder each party shall comply in all material respects with all Federal, state and local laws and regulations applicable to it, and with the Card Payment Companies rules and regulations currently in effect and as hereafter amended.

## Section 7.
## Payment for Services

7.1     Fees payable by Customer for transaction processing and related services are set forth on Schedule A, provided, however, that the minimum fees payable to CWP shall be the actual amount paid by Customer to CWP for each month during  the first Processing Year  and for Processing Year Two and  each succeeding year shall be as follows:  a) In Processing Year Two, $5,000 per month, b) in Processing Year Three, $7500 per month, c) in Processing Year Four, $10,000 per month and d) in Processing Year Five, the greater of $10,000 per month or 50% of the aggregate fees payable to CWP during the immediately preceding Processing Year, divided by twelve (the "Monthly Minimum").  In addition, each month during the term of this Agreement, Customer shall reimburse CWP, or pay the applicable vendor directly, for all third party costs incurred by CWP in connection with providing the services contemplated hereunder, including but not limited to all fees from third party communications vendors or the Card Payment Companies.  Schedule A may be amended from time to time at the mutual consent of the parties to reflect pricing for additional agreed upon services to be performed hereunder. During each Processing Year after the first Processing Year CWP may increase any or all of the fees set forth in Schedule A by an amount not to exceed the lesser of (i) 3% or (ii) the percentage increase in the Consumer Price Index ("CPI") during the applicable one (1) year period described below ("**CPI Percentage Increase**"). Any such increases shall be calculated based upon the fees in effect on the date such increase is fixed as provided below.  For purposes of this Section 7.1, the CPI shall mean the consumer price index compiled by the United States Department of Labor Bureau of Labor Statistics, for all urban consumers (CPI-U) having a base of 100 in 1982-84, seasonally adjusted, using that portion of the index which appears under the caption "All Items." The CPI Percentage Increase shall be calculated over the one (1) year period ending on the last day of the fourth (4th) calendar month before the beginning of the Processing Year during which the increase in fees will apply. CWP shall provide Customer with sixty (60) days' notice of any increase in fees under this Section 7.1.   Schedule A shall be deemed amended upon the occurrence of any price increase contemplated in this Section 7.1 effective as of the effective date of such increase.

7.2     All fees and other amounts due relating to the services performed during each calendar month during the term of this Agreement and all adjustments and debits that are made in the ordinary course of business shall be invoiced by CWP to Customer on a monthly basis. CWP may, at any time on or after the 20th day after the date of such invoice, draw payment of such invoice from the Customer bank account to be established, maintained and funded by Customer for this purpose (the "**Payment Account**"); provided, however, that the establishment, maintenance and funding of the Payment Account, and CWP's right to draw payment therefrom hereunder, shall not affect in any way Customer's underlying obligation to pay any and all amounts due to CWP hereunder as and when due. Promptly upon execution and delivery of this Agreement and prior to the initiation of services, Customer shall furnish CWP the account number and the transit routing number of the Payment Account and irrevocably instruct the depository bank for the Payment Account to honor all CWP drawings. If Customer disagrees with any amount included in any invoice, it shall notify CWP of such disagreement within sixty (60) business days of receipt of the applicable invoice. Such notice shall not affect CWP's right to draw from the Payment Account any undisputed invoiced amounts. The parties will act in good faith to revolve any such dispute. Customer shall at all times maintain sufficient balances in the Payment Account to cover all fees, payments, adjustments and processing entries which will be made pursuant to and during the term of this Agreement and for a minimum of sixty (60) days after termination of services and any de-conversion period agreed to by the parties. Interest shall be due on late payments at the rate of the existing prime interest rate . Each party shall be liable to the other for all costs, including reasonable attorneys' fees, incurred in connection with the cost of collection of any amounts due hereunder.

**Section 8.**
**Term**

The initial term of this Agreement shall begin on the Effective Date and end at the end of the fifth (5th) Processing Year. This Agreement shall be automatically renewed for an additional term of one (1) Processing Year beginning at the end of the fifth (5th) Processing Year and shall be automatically renewed on each anniversary of such date thereafter, unless either party gives written notice of termination to the other party at least 180 days before the expiration of any such term.

**Section 9.**
**Termination**

9.1     This Agreement may be terminated by either party:

(a)     Upon completion of any then-current term for which the terminating party has provided proper notice of non-renewal under Section 8.

(b)     For breach by the other party of any material provision of this Agreement and failure to cure such breach within fifteen (15) days of notice specifying the cause thereof. Notice of such termination must be provided no more than fifteen (15) days following the breaching party's failure to cure.

735481_3

9.2    The foregoing subsection 9.1 notwithstanding, CWP shall have the right to terminate this Agreement effective immediately upon either (a) Customer's failure to cure, within one (1) business day of notice thereof, any payment breach hereunder or (b) four (4) or more payment breaches during any twelve (12) month period.

9.3    CWP may terminate immediately upon receipt of notice from a Member of termination of its sponsorship of Customer in either or both Card Payment Companies or if (a) a petition shall be filed by Customer or a Member seeking relief under any bankruptcy, insolvency or similar law (or, in the case of a Member, a conservator or receiver has been appointment under 12 U.S.C. Section 1821) or (b) such a proceeding shall be commenced against either Customer or a Member and not dismissed within sixty (60) days thereafter.

9.4    Notwithstanding any other provision herein, Customer may terminate immediately in the event CWP is unable to perform services set forth in Sections 2.2 and 2.3 for a period in excess of two (2) consecutive calendar days.

9.5    CWP and Customer have agreed upon the fees set forth on Schedule A hereto based upon anticipated levels of processing activity and upon the expected length of the initial and renewal terms of this Agreement. Customer acknowledges the difficulty of determining the actual damages that would be suffered by CWP in the event of (a) any termination by Customer before the end of the initial or any renewal term, other than for cause; or (b) any termination for cause by CWP. Accordingly, upon any such termination, Customer shall pay to CWP in accordance with the terms and schedule of this Agreement or any renewal period, in cash, as liquidated damages and not as a penalty, an amount equal to the then applicable Monthly Minimum multiplied by the sum of (i) the number of months remaining in the then current term of this Agreement plus (ii) the number of months in any renewal term to which the parties have agreed pursuant to the terms of Section 8 hereof; provided, however, that nothing in this Section 9.5 shall limit in any way the right of any CWP Indemnified Party to be indemnified by Customer pursuant to Section 11.2 hereof for any Losses incurred by them arising from any third-party claim or otherwise.

### Section 10.
### Effect of Termination

10.1    Immediately upon termination, whether by expiration of the term or otherwise, CWP's obligation to provide services hereunder shall immediately cease, and any unpaid amounts due and owing by Customer shall become immediately due and payable in accordance with the terms and schedule of this Agreement or any renewal period.

10.2    Payment for any services rendered or any other obligation or liability hereunder owing at the time of termination or thereafter shall not be affected by termination of this Agreement.

10.3    CWP will provide all reasonable assistance to transfer Customer's merchants to another payment processor; provided, however, all costs of transfer shall be at Customer's sole expense based upon CWP's then current rates for de-conversion of merchant accounts. Provided Customer is not in default of payment of any amounts due to CWP, CWP will provide processing

7

services for up to one hundred eighty (180) days following termination to afford Customer a reasonable amount of time for such transfer.

## Section 11.
## Indemnification; Limitation of Damages

11.1    CWP shall indemnify and hold Customer and its respective officers, members, directors and employees (each a "**Customer Indemnified Party**") harmless from any and all claims, costs, liabilities, losses, damages or expenses (including reasonable attorney's fees) (collectively, "**Losses**") incurred by a Customer Indemnified Party arising out of (i) any failure by CWP or its employees or agents to comply with the terms of this Agreement or (ii) any negligence, fraud or willful misconduct by CWP or its officers, directors or employees; provided, however, that CWP shall not be obligated to indemnify any Customer Indemnified Party for any Losses arising out of the gross negligence or willful misconduct of any Customer Indemnified Party.

11.2    Customer shall indemnify and hold CWP and its respective officers, members, directors and employees (each a "**CWP Indemnified Party**") harmless from any and all Losses incurred by a CWP Indemnified Party arising out of (i) CWP's performance of its obligations hereunder, (ii) any failure by Customer or its employees or agents to comply with the terms of this Agreement or (iii) any negligence, fraud or willful misconduct by Customer or its officers, directors or employees; provided, however, that Customer shall not be obligated to indemnify any CWP Indemnified Party for any Losses arising out of the gross negligence or willful misconduct or any CWP Indemnified Party.

11.3    CWP's cumulative liability for any Losses, direct or indirect, for any cause whatsoever (including, but not limited to those arising out of or related to this Agreement and including the indemnification provided in Section 11.1 above) shall not, under any circumstances, exceed fifty percent (50%) of the fees paid to CWP hereunder for services performed in the immediately preceding twelve (12) month period.

11.4    Notwithstanding the indemnification provided in Section 11.1, CWP shall not be liable to Customer, to merchants of Customer, to a Member or to any other party for any of the following and Customer shall indemnify and hold CWP harmless from any Losses directly or indirectly arising therefrom:

(a)    Fraudulent or unauthorized transactions processed by CWP and originating from Customer or its merchants, or

(b)    Selection and operation of any point-of-sale devices or software by Customer or its agents and merchants or for loss of data in transit between Customer's agents and merchants and CWP or between CWP and acquirers and issuers except for any Losses directly attributable to preventable or gross negligence, willful misconduct or fraudulent misconduct by CWP or its officers or employees. CWP will use commercially reasonable efforts to contract with third parties for the products and services on which it is dependent, including, but not limited to, communications carriers, voice authorization providers, equipment manufacturers and their associated hardware and software providers, whether owned or licensed,

8

and Customer acknowledges that CWP shall not be liable to Customer for any Losses suffered or incurred by Customer or its merchants attributable to the fault or negligence of any such third party or parties provided that CWP has exercised commercially reasonable due diligence in selecting the party or parties to provide such service. In the event of loss of interchange processing data, CWP will use commercially reasonable efforts to re-create and provide the lost data to the appropriate Card Payment Companies or to Customer within a reasonable time.

      11.5    Notwithstanding the indemnification provided in Section 11.1, CWP shall not be liable to Customer for any Losses unless Customer provides written notice to CWP of the occurrence that gave rise to the alleged liability within thirty (30) days of the date Customer became aware of the occurrence.

      11.6    Procedure for Indemnification Claims.

      (a)    The parties agree that if (i) any claim is made or any suit or action is commenced against either party that may give rise to a right of indemnification for such party hereunder, or (ii) any knowledge is received of a state of facts which, if not corrected, may give rise to a right of indemnification for such party hereunder (in either such case, such party the "Indemnified Party") from the other party ("in either such case, the Indemnifying Party"), the Indemnified Party will give notice to the Indemnifying Party as promptly as practicable after the receipt by the Indemnified Party of notice or knowledge of such claim, suit, or action. Notice to the Indemnifying Party under the preceding sentence shall be given no later than fifteen (15) days after receipt by the Indemnified Party of service of process in the event a suit or action has commenced or thirty (30) days under all other circumstances. The failure to give prompt notice shall not relieve an Indemnifying Party of its obligations to indemnify except to the extent the Indemnifying Party is prejudiced by such failure. The Indemnified Party shall make available to the Indemnifying Party and its counsel and accountants at reasonable times and for reasonable periods, during normal business hours, all books and records of the Indemnified Party relating to any such possible claim for indemnification, and each party hereunder will render to the other such assistance as it may reasonably require of the other in order to insure prompt and adequate defense of any suit, claim or proceeding based upon a state of facts which may give rise to a right of indemnification hereunder.

      (b)    The Indemnifying Party shall have the right to defend, compromise and settle any third party suit, claim or proceeding in the name of the Indemnified Party to the extent that the Indemnifying Party may be liable to the Indemnified Party in connection therewith; provided, that any such settlement shall not contain any admission of fault or wrongdoing on the part of the Indemnified Party. The Indemnifying Party shall notify the Indemnified Party within ten (10) days of having been notified pursuant to this Section 11.6(b) if the Indemnifying Party elects to assume the defense of any such claim, suit or proceeding and employ counsel, provided that the Indemnified Party does not object to such counsel in a reasonable exercise of its discretion. The Indemnified Party shall have the right to employ its own counsel if the Indemnifying Party so elects to assume such defense, but the fees and expenses of such counsel shall be at the Indemnified Party's expense, unless (i) the employment of such counsel shall have been authorized in writing by the Indemnifying Party; (ii) the Indemnifying Party shall not have employed counsel to take charge of the defense of such action after electing to assume the defense thereof, or (iii) the Indemnified Party has defenses available

9

to it which are different from or additional to those available to the Indemnifying Party (in which case the Indemnifying Party shall not have the right to direct the defense of such action on behalf of the Indemnified Party), in any of which events said reasonable fees and expenses shall be borne by the Indemnifying Party.

(c)     The Indemnified Party may at any time notify the Indemnifying Party of its intention to settle or compromise any claim, suit or action against the Indemnified Party (without the consent of the Indemnifying Party) in respect of which indemnification payments may be sought from the Indemnifying Party hereunder, provided that the Indemnifying Party shall have no liability in respect of such settled or compromised claim, suit or action.

(d)     The Indemnifying Party shall be subrogated to any claims or rights of the Indemnified Party as against any other persons or entities with respect to any amount paid by the Indemnifying Part under this Section 11.6. The Indemnified Party shall cooperate with the Indemnifying Party, at the Indemnifying Party's expense, in the assertion by the Indemnifying Party of any such claim against such other persons or entities.

11.7    IN NO EVENT SHALL EITHER PARTY BE RESPONSIBLE TO THE OTHER FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING FROM OR AS A RESULT OF ANY BREACH OF THIS AGREEMENT.

### Section 12.
### Proprietary and Confidential Information

12.1    Each party acknowledges that in the performance of their obligations hereunder (a) it may be entrusted with Confidential Information of the other party and (b) it will keep all such Confidential Information confidential and will not disclose it to any person except that either party may disclose the other party's Confidential Information:

(a)     To its employees and representatives, to the extent required to perform its obligations under this Agreement, provided that such employees and representatives agree to be bound by the confidentiality provisions herein;

(b)     That was or becomes generally available to the public other than as a result of a disclosure by the party not claiming ownership of the Confidential Information;

(c)     That is required to be disclosed by any state or federal bank regulatory agency, any Card Payment Companies, any court order or pursuant to any governmental process; and

(d)     Upon written consent of such party.

12.2    For purposes of this Agreement, the term "**Confidential Information**" shall mean the following:

(a)     Any information, know-how, data process, technique, design, drawing, program, formula or test data, work-in-progress, engineering, manufacturing, marketing;

10

735481_3

financial, sales supplier; customer, employee, investor or business information, whether in oral, written, graphic, electronic or other form; or any other information of a business nature to the extent not disclosed to or generally known by those persons engaged in business similar to that conducted by the party claiming confidentiality (other than by the act or acts of an employee not authorized by the party claiming confidentiality to disclose such information) of either party, its parents, affiliates or subsidiaries, or information from any third party which was disclosed to the party claiming confidentiality; or

(b)     Any trade secret and any patentable and/or copyrightable subject matter, including, but not limited to, ideas, inventions, processes, formulae, methods, refinements, source code and listings, enhancements, specifications, user manuals, screen displays and formats, computer and software documentation, software performance results, data and data formats, protocols, network configurations and the like which are conceived, developed, created or owned by the party claiming confidentiality; all confidential or secret letters, memoranda, summaries, notes and any other documents or data in any form or recorded on any medium pertaining to either party or its respective business.

12.3     Failure to mark any Confidential Information as "Confidential" shall not affect its status as Confidential Information under this Agreement.

12.4     Each party shall use the same degree of care to protect the Confidentiality Information of the other party that it would use for the protection of its own Confidential Information.

12.5     Customer acknowledges that all software programs, software systems designs or architectures, plans, documents, know-how and data bases provided by CWP (collectively, the **"CWP Systems"**) are, and shall remain, the property of CWP or any third party licensor providing software for CWP's use and that the CWP System shall include any modifications thereto made specifically at Customer's request and cost. Further, use of the CWP System does not grant to Customer any proprietary or license rights to the system or any part thereof except as may be specifically set forth in this Agreement.

12.6     CWP acknowledges that all merchant records, merchant data, including transaction data, and any other information acquired by CWP from Customer and its employees, agents and merchants are, and shall remain the property of Customer and the Member.

12.7     Each party acknowledges that the disclosure of Confidential Information will immediately give rise to continuing irreparable injury to the other party which may not be compensable at law. Accordingly, each party may obtain immediate injunctive relief against the breach or threatened breach of this Article 12, in addition to any other remedies that may be available to it

### Section 13.
### Warranties; Disclaimer of Warranties

13.1     <u>Third Party Components</u>. CWP represents and Customer acknowledges that (a) CWP's processing systems and software may contain software and hardware components that are either owned by a third party or in the public domain, and (b) CWP has no proprietary

11

735481_3

interest in such software or hardware, and as such, cannot grant to Customer a license to use such software or hardware and any related documentation. CWP represents and warrants that it has the necessary licenses and/or permissions to utilize such hardware and software for performance of this Agreement, CWP MAKES NO WARRANTIES OR REPRESENTATION AS TO SUCH THIRD PARTY SOFTWARE OR HARDWARE (INCLUDING ANY WARRANTY OF NON-INFRINGEMENT) AND FURTHER DISCLAIMS ANY AND ALL LIABILITY FOR ANY LOSSES OR DAMAGES THAT MAY RESULT FROM THE USE THEREOF EXCEPT AS MAY BE OTHERWISE SET FORTH IN THIS AGREEMENT.

13.2    Disclaimer of Warranties.  EXCEPT FOR THOSE WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, CWP MAKES NO WARRANTIES REGARDING THE USE, OPERATION OR PERFORMANCE OR NON-PERFORMANCE OF SOFTWARE AND SYSTEMS UTILIZED FOR THIS AGREEMENT, WHETHER EXPRESS OR IMPLIED, AND CWP EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

### Section 14.
### General Provisions

14.1    Disclosure.  Each party shall promptly notify the other of any claim, demand, action, suit or proceeding, facts or circumstances, or the prospect or threat of the same, which might materially and adversely affect either party's ability to perform its obligations pursuant to this Agreement.

14.2    Assignment.  Customer may not assign this Agreement or any of its rights and obligations herein to any third party without the prior written consent of CWP which consent shall not be unreasonably withheld.

14.3    Amendment; Waiver.  Neither this Agreement, nor any of the Schedules shall be amended, modified or waived in any fashion except by an instrument in writing signed by the parties hereto. No delay on the part of any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party hereto of any right, power or privilege hereunder operate as a waiver of any other right, power or privilege hereunder, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

14.4    Notice.  All notices, demands and other communications hereunder shall be in writing and shall be delivered in person or deposited in the United States mail, certified or registered, with return receipt requested, or sent by reputable overnight delivery service as follows:

        If to CWP:          CardWorks Processing, LLC
                            6390 E. Broadway
                            Tucson, AZ  85710
                            Attention: Donald M. Berman

735481_3

With a copy to:        CardWorks, Inc.
                       101 Crossways Park W.
                       Woodbury, NY 11797
                       Attention: Alfred Kiefer

If to Customer:        BankCard Central, Inc.
                       105 E. 5th Street
                       Kansas City, MO 64106

The persons or addresses to which mailings or deliveries shall be made or facsimiles sent may be changed from time to time by notice given pursuant to the provisions of this subsection 14.4.   Any notice, demand or other communication given pursuant to the provisions of this subsection 14.4 shall be deemed to have been given on the date actually delivered or five days following the date deposited in the United States mail, properly addressed, postage prepaid, as the case may be.

14.5    Relationship of Parties.  Nothing contained in this Agreement or the Schedules shall be construed as constituting a partnership, joint venture or agency between CWP and Customer. The parties are independent parties to an agreement and shall be deemed independent contractors for all purposes.

14.6    New York Law.  This Agreement shall be governed by the laws of the State of New York applicable to agreements made, and wholly to be performed, in New York.  Any litigation arising out of this Agreement may be brought only in a Federal or state court located in New York County, New York.  The parties hereby submit to the jurisdiction and venue of said courts.

14.7    Limitation of Actions.  No action arising from this Agreement may be brought by Customer more than one (1) year following the event that gave rise to the action or when the event was known or reasonably should have been known by the Customer, but in no event later than three (3) years following the event that gave rise to such action.

14.8    Headings; Severability.   The headings contained in this Agreement are for convenience of reference only and do not form a part of this Agreement. If any provision of this Agreement, or the application or any such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

14.9    Force Majeure.

(a)    Neither party shall be liable to the other by reason of any failure in the performance of this Agreement to the extent such failure arises beyond the control of that party Such causes may include but are not limited to acts of God, acts of civil or military authority, fires, strikes, unavailability of energy resources, delay in transportation, riots or war.  In the event of any such occurrence, the disabled party shall thereafter endeavor to perform its

13

735481_3

obligations as promptly as possible. The disabled party shall promptly and in writing advise the other party if it is unable to perform due to any such event, the expected duration or such inability to perform and of any developments (or changes therein) that appear likely to affect the ability of that party to perform any of its obligations hereunder in whole or in part.

14.10   Taxes.  With the exception of CWP income, franchise, payroll, and FICA taxes, which shall be payable by CWP, Customer shall pay all sales, use and other taxes resulting from or payable in connection with the provision of the services hereunder that are imposed on Customer by the appropriate taxing authority.

14.11   Counterparts.  This Agreement may be executed in one or more counterparts with the same effect as if all parties hereto had signed the same documents.  All counterparts so executed and delivered shall be deemed to be an original, shall be construed together and shall constitute one agreement.

14.12   Survival.  The provisions of Articles 7, 10, 11, 12, 13, and 14 shall survive any expiration or termination of this Agreement.

14.13   Integrated Agreement.   This Agreement, the Schedules hereto and all other documents and instruments delivered in accordance with the terms hereof constitute the entire understanding and agreement among the parties hereto with respect to the subject matter hereof; and there are no agreements, understandings, restrictions, representations or warranties among the parties other than those set forth herein or herein provided for.

IN WITNESS WHEREOF, the parties hereto, by their representatives duly authorized, execute this Agreement as of the day and year written above.

CARDWORKS PROCESSING, LLC

Name: _____

Signature: _____

Title: _____

Bankcard Central, Inc.

Name: _RICHARD W. NOBLE_____

Signature: _____

Title: ___CEO_____

14